[No appeal was taken in this case.]

AMOS A. WILLIAMS
vs.
THE SAVAGE MANUFAC-
TURING COMPANY.
} SEPTEMBER TERM, 1848.

[VACATING SETTLEMENT—PARTIES TO SUIT—SURCHARGING AND FALSIFYING ACCOUNTS—ACT OF 1845, CH. 367—APPEAL.]

TRUSTEES under a deed, one of the trusts of which was, that after satisfying the purposes of the deed, viz. the payment of the debts of the grantor, the residue of the property should be held for the use of the grantor, were also appointed his trustees under the insolvent laws ; and, acting in this double capacity, transferred certain stocks belonging to the grantor (the complainant) to the defendant. All his debts having been paid, and the trustees directed by a decree of this court to convey to him all the property they had not disposed of in performance of their duty as trustees in insolvency : it was HELD—

That the complainant was entitled to maintain a bill for the recovery of the stock from the defendant, upon the ground, that the transfer had been improperly obtained ; and, that the trustees were not necessary parties to such suit.

Where an agreement was made to settle a claim presented to the complainant, in the form of a stated account, which, without examination, was assumed to be correct, the complainant will be allowed to surcharge and falsify such

account, to the extent of the errors specified in his bill, independently of the question of fraud, actual or constructive.

The court is to take the account, as stated, and the *onus probandi* is upon the party having liberty to surcharge and falsify ; and he will be restricted to proof of errors specified in his bill.

When the accounts upon which the settlement was based, were presented to the complainant, he was deprived of much of his mental capacity, and incapable of giving them that examination which was indispensable to their full comprehension. HELD—

That under these circumstances, it was the duty of the court, if errors were pointed out, to permit the plaintiff to surcharge and falsify the accounts, though the settlement based upon them was regarded as a family settlement, which the court will usually uphold with a strong hand.

A party having elected to examine witnesses upon their *voir dire*, is precluded from resorting to any other mode to show their interest in the event of the suit.

An appeal and a bond to prosecute the appeal, will not, under the act of 1845, ch. 367, independently of the direction of the court, delay the execution of the order appealed from.

Whether such direction shall or shall not be given, is referred by the legislature to the sound discretion of the court, upon a view of all the circumstances of the case.

[The facts of this case are fully stated in the Chancellor's opinion :]

THE CHANCELLOR:

This cause, which has been argued with an ability every way worthy the eminent counsel engaged in it, has received the most deliberate consideration of the court. It is justly regarded as one of much importance, not only with reference to the influence which the decision may have upon the pecuniary interests of the parties ; but on account of the questions which have been discussed so elaborately, and, which derive additional importance from the relations which the parties really concerned in the controversy bear to each other.

It appears from the pleadings and proofs, that by an act passed by the legislature of this state, at December session, 1821, ch. 201, the defendant was incorporated by the name of the Savage Manufacturing Company, for the purpose of manufacturing and vending of cotton goods, and the carrying on of any other branches of manufacture in their discretion ; for which

purpose they were authorized to purchase and hold land in fee simple or otherwise, not exceeding three hundred acres at a time, and to erect thereon, all necessary buildings, with a capital of one hundred and fifty thousand dollars, divided into fifteen hundred shares, of one hundred dollars each.

That the company organized soon after the date of the charter, and went into operation ; the complainant at or about that time, becoming their agent at its manufacturing establishment, on the little Patuxent River, in Anne Arundel County—that this agency was continued from that time, until the 6th of July, 1839, when he tendered his resignation, which was accepted, and his brother, Cumberland D. Williams, was appointed in his stead.

The bill alleges, that in June, 1839, the complainant became afflicted with sickness, which entirely disqualified him from attending to business of any kind, and that he remained in this condition until the fall of 1844, when he was restored to health in mind and body—that of the capital stock of the company, which amounted to $108,100, the sum of $37,632 32 stood on its books in the name of the complainant, and that his property, including this stock, at the commencement of his sickness, was probably worth over and above all his just debts, about $35,000 —that in this condition of his mental and bodily health, his brothers, George Williams, Cumberland D. Williams, and Nathaniel D. Williams, addressed his, the complainant's son-in-law, a letter upon the subject of making a will, to prevent his property from passing out of his family, but being disappointed in their views in this respect, by his refusal or neglect to comply with their suggestions, they, the brothers, determined to destroy that which they could not obtain, and reduced the complainant to poverty, by the means and instrumentalities which the bill then proceeds to point out—these consisted, as set forth in the bill, in instigating his creditors to sue him, and in a suit which the Savage Manufacturing Company instituted against him for an alleged indebtedness ; the company at that time being altogether controlled by his brother, George and Nathaniel —that in consequence of these proceedings, thus instigated by

his said brothers, and at the suggestion of one of them, he, in April, 1843, petitioned for the benefit of the insolvent laws, and obtained his discharge in August, of the same year—that from that time until early in the year, 1844, he remained undisturbed by his creditors, but that, in the year 1844, Nathaniel Williams, who had promoted the suit of the company, and which had been referred to counsel, began to press the settlement of that claim and by the contrivances which the bill details, succeeded in obtaining in satisfaction of this pretended claim a transfer of the stock of the complainant in the company to the amount of $9632 32.

That the settlement, by which a transfer of this stock was obtained, was founded upon accounts, one of which' was prepared by Cumberland D. Williams, in concert with his brothers, Nathaniel and George, and the other by a clerk of said George, who prepared the same under the direction of his employer.

The bill charges, that these accounts were false in many particulars, and known to the framers thereof to be such, and are, therefore, fraudulent in fact, and in contemplation of this court, and then proceeds to surcharge and falsify the same in some of the most important items.

The complainant further alleges, that when restored to health, bodily and mentally, in the fall of 1844, he found himself, who had fallen sick worth about $35,000, an insolvent debtor, and, that the active and prominent agents in reducing him to this condition, were his brothers, George and Nathaniel, who, during his state of imbecility, had put the machinery in operation to accomplish his ruin.

That after the institution of the first suit against him, to wit, on the 15th of September, 1840, the complainant, at the suggestion of his brother, Nathaniel Williams, executed a deed of trust of all his property to Charles F. Mayer, Esq., and his (the complainant's) son-in-law, George W. Burnap, and, that the provisions of that deed, which will be noticed hereafter, were advised by the said Nathaniel.

That, the claim set up by the company, against the complainant, and, which had been exhibited by his said brother,

was stated to be $7685 98, to which his said brother, acting
for the company, had undertaken, upon the pretence, that he,
the complainant, had, in some respect, violated his duty to-
wards said company, of his own motion, without foundation,
proof, or authority, to mulct him in the sum of near $2000
and that swelled the amount which it was pretended he owed
the company, to the sum of $9632 32—that influenced by the
representations made him by the said Nathaniel, and incapable
of the mental effort necessary to look into his own concerns,
the complainant united with his trustees, in transferring to the
company, that amount of his stock on the 20th of July, 1844,
in settlement of said pretended claim against him, which, by
the merger of so much of the stock, reduced the capital of the
company by that amount.

The bill, then, after particularly pointing out the alleged er-
rors in the accounts of the company against the complainant,
and averring, that upon a true and fair settlement, there would
be found a balance due him, alleges, that his said brothers,
George and Nathaniel, well knew that said accounts had been
improperly adjusted, and that he, the complainant, was induced
by solicitations and menaces, which in his enfeebled state of
health he was incapable of resisting, to transfer stock in said
company at the par value thereof, in satisfaction of said pre-
tended balance ; and the prayer is, that said settled account may
be opened, and that the complainant may be permitted to sur-
charge and falsify the same, as well in the particulars men-
tioned as in all others which may be made apparent in the pro-
gress of the cause—that an account may be taken, and that if
anything shall be found due from the company, they may be
required to pay the same—and that if the complainant shall be
found to be indebted to the defendant, the former, upon the
payment of the same, shall be declared entitled to a re-transfer
of his stock, and for general relief.

These seem to be the material allegations of the bill, filed
with which, as exhibits, are the accounts upon which the settle-
ment is charged to have been based, with another exhibit pre-
pared according to the complainant's view, by which one of

the accounts, upon which the settlement is alleged to have been founded, is so essentially altered, that instead of showing a balance due from the complainant to the company of $5302 55, there seems to be due from the latter to the former, the sum of $3274 34.

It appeared also, that, upon the application of the complainant for the benefit of the insolvent laws in 1843, Messrs. Mayer and Burnap, the trustees named in the conventional deed of 1840, were appointed and qualified as his permanent trustees ; and it also appeared, and was so charged, that, prior to the filing of the bill in this case, the complainant filed his bill against the said parties as his permanent trustees, alleging that all his debts were paid, and praying that his said trustees, might be directed to release and reconvey to him all the property vested in them, by deed or operation of law, and his application for the benefit of the insolvent laws, except such parts of said property as may have been conveyed or transferred by said trustees in the execution of their office. And the Chancellor, on the 11th of December, 1845, passed his decree, by which, the said Mayer and Burnap, as permanent trustees, were directed to convey to the complainant, all the property of every description, which had not been disposed of or otherwise affected by said trustees, in the performance of their duty as trustees under said insolvent laws.

The answer of the company denied, in very explicit terms, the various charges of fraud and imposition alleged in the bill, and gave a full detail and vindication of the several items in the accounts which had been assailed ; giving the detail and explanation, however, under a protest that it was not necessary for the purposes of the defence, and only because the answer, if such explanations were omitted, might, in that respect, be deemed short—the ground taken in the answer, being, "that the agreement was not based on any audit or statement of accounts, between the complainant and respondent, or, in any asserted ascertainment of claims against the complainant; it being intended to be, and being in fact, a compromise of all disputes as appears upon the face of the agreement.

Beside expressly denying the charges of fraud, defending the items of claim impeached by the bill, and placing the defence of the settlement, upon the ground of compromise ; the answer presents various other objections to the relief sought by the bill, or to any relief being granted this plaintiff, which will be briefly noticed hereafter.

The case of *Farnam* vs. *Brooks*, 9 *Pick.*, 212, has been very much pressed by the counsel on both sides, as establishing principles important to the views which each has attempted to maintain.   That appears to have been the case of a compromise of unsettled accounts between the parties, by which a smaller sum was received in satisfaction of the debt than the sum subsequently ascertained to be due ; and yet, although the court decided, expressly, that the charge of fraud was not made out, they permitted the plaintiff to surcharge and falsify the account on which the settlement was made.   The sum agreed to be received in satisfaction in that case, was $60,000 ; and that amount was fixed upon, upon a statement of the account, as prepared by the defendant, by which it appeared, that the sum actually due, was $64,000, on payment of which, the intestate of the plaintiff gave to the defendant a receipt in full, and a transfer of all his interest in the concern in which they were partners, in relation to the business of which the accounts were stated.   It subsequently appeared, upon a more careful examination of the account, that the sum really due was $68,000, growing out of errors, in omitting sums which ought to have been credited, and charging others which ought not to have been debited, and upon this ground, and, notwithstanding, the court expressly declared, "that these errors furnished no ground of suspicion of unfairness or fraud," the plaintiff was permitted to surcharge and falsify the account on which the settlement was made, although nearly twenty years had elapsed from the date of the settlement to the filing of the bill.

That case, in many of its features, will be found to bear a close resemblance to the present ; and, I am much mistaken, if the doctrines established by it with so much ability and learning, will not justify the order which will be passed in this case.

My opinion, therefore, upon this part of the case is, that though the settlement will not be set aside as fraudulent, the plaintiff should be allowed to surcharge and falsify the account upon which, as I think, it was made; and the next question is, to what extent has he succeeded in proving the errors specified in his bill, for to these he must be restricted. 2 *Daniels' Ch. Pr.,* 765.

The court is to take the account as it is stated, and the *onus probandi* is upon the party having liberty to surcharge and falsify. If he can show an omission, he may surcharge; and if a wrong charge is made against him in the account, it will be stricken out, which is a falsification.

To what extent, then, has the plaintiff succeeded in pointing out errors of either description in the account, is the question.

It is first alleged, that in the account between the Savage Rail Road Company and the defendant, which is one of the elements of the account I. I., upon which the statement was made, the defendant was prejudiced by allowing him dividends only on the amount of the stock held by him in the rail road company, which was $12,000, instead of on the whole capital of $15,000. My opinion upon this is, that as that account was stated, the whole dividends should have been credited. It is an account between the two companies, and not between the complainant, as a stockholder in the rail road company, and the defendant. The road is charged with all the advances made to it by the defendant, and not with such proportion thereof as would correspond with the complainant's interest in the road. Surely, if the complainant is considered the sole proprietor of the road, so far as to charge him with all advances to it, he should be regarded in the same light with reference to credits.

I am not satisfied, however, that the defendant continued to use the road to the 1st of July, 1843, as alleged in the bill. The answer expressly denies it; and the proof offered in opposition to the answer I do not deem sufficient. The account, therefore, in this respect will stand, unless further and fuller proof shall be introduced.

The charge of ten per cent. on the cash balances cannot be

supported. It by no means follows, that because tolls are paid at the rate of ten per cent. on the capital stock, that, therefore, it would be just to charge the road ten per cent. on cash balances due from it. Out of the tolls the expenses of the road are to be paid ; and it may very well happen, that when they are defrayed, much less than six per cent. would remain for the stockholders.

I do not think the charge in the same account of $1,350, can be supported. That sum appears to me, from the evidence, to have been placed in the hands of the complainant, as the agent of Patrick T. Jackson, mentioned in the receipt of C. D. Williams, of the 19th of September, 1828.

It also appears to me, that the sum of $1,350, charged to the complainant in the account marked I. I., is identical with the sum charged in the rail road account, and is thus twice charged, when, as I think, from the proof now before me, it should not have been charged at all.

With regard to the sum of $2,353 33, charged to the complainant in the account I. I., being for money, the property of the defendant, paid by the complainant, in the purchase of land from Mr. Herbert and Mr. Worthington, the plaintiff has not succeeded in satisfying me that the charge is erroneous.

It is very clear, I think, that even if the charter of the Savage Manufacturing Company authorized them to purchase and hold these lands, that the mode in which the complainant, according to his own showing, procured the assent of the stockholders, conferred upon him no power thus to use the corporate funds. And, moreover, when the complainant petitioned for the benefit of the insolvent laws, in the spring of 1843, he returned Mr. Worthington, as one of his creditors, for lands purchased. Now, although this was at a period prior to the full restoration of the complainant to health, in mind and body, and although I am pursuaded, that his mind was at that time enfeebled, and, perhaps, unfitted to investigate and understand accounts of a complicated nature ; yet, I am far from thinking he could not comprehend the simple proposition, whether this debt due Mr. Worthington, was due from him or from the Savage Factory.

Something was said in the argument about the land which was purchased from Herbert, having been conveyed to Mr. Lansdale, and one of the defendant's exhibits does show, that on the 28th of November, 1843, a parcel of land was conveyed to Lansdale by Herbert and wife, for the sum of $4,755 25. It does not appear, however, that the land mentioned in this conveyance is the same with that on account of which the money charged in the account was paid by the complainant. And, moreover, the money charged in the account is charged as of the 1st of June, 1839, four years and more before the deed to Lansdale; and, I do not understand from the bill, that the objection to the charge is put upon the ground, that the purchase was made by, and the conveyance made to, Lansdale. The ground taken in the bill is, that these lands were purchased "with the concurrence and under the direction of the stockholders owning more than a major part of all the stock of the company."

As to the sum of $590, for which the complainant claims a credit, it seems to me, some further explanations should be offered, before it is allowed as such.

I do not think the complainant can be charged with any part of the money expended in erecting the furnace. It was erected on the grounds of the defendant; and there is such a mass of proof going to show that it was treated and considered as the property of the company, by its agents and shareholders, that I do not see how it can be resisted. It would occupy much time and space to refer particularly to this evidence; and I, therefore, only advert to the depositions of Messrs. Gordon, Todhunter and Patterson, and to the complainant's exhibit, being a statement of the expenditures of the Savage Manufacturing Company, in which the cost of this furnace is put down at $8000, as conclusive to show that this expenditure was regarded as a company expenditure, and the furnace as company property.

As respects the alleged credits to which the complainant claims to be entitled, and for the omission to give which he seeks to surcharge the account, I am of opinion, that looking

to the evidence of Mr. Capron and Mr. Lansdale upon this point, that the complainant is entitled to be credited at the rate of $300 per annum, for entertaining the proprietors and others at the factory, during the period he lived there as its agent, or rather, from the 1st of July, 1832, to July, 1839. The agreement under date the 16th of October, 1832, says, expressly, that he shall be indemnified for this expense, and the witness referred to proves, that $300 per annum would be no more than a reasonable allowance therefor.

The complainant's salary, however, cannot be credited to a period subsequent to the 6th of July, 1839, when he resigned, as shown by a letter of that date; and, I can see no ground upon which he can be allowed a higher rate of compensation, as agent, than $1000 a year—that being the sum named in the agreement of October, 1822, signed by the complainant and the proprietors.

These are all the items of surcharge and falsification specified in the pleadings, and to these the parties must be confined. The case will, therefore, go to the Auditor, with directions to state an account accordingly, preparatory to a final decree. The settlement itself must stand, because I do not think the charge of fraud is established, and such a decree will be passed, when the account comes to be stated, as the justice of the case may require.

I do not think the exceptions to the evidence of Benjamin Williams, Joseph B. Williams and George H. Williams have been sustained, assuming them to be legatees under the will of Mrs. Weld. The plaintiff examined them upon the *voir dire*, and they denied any interest in the event of the suit; and having elected to take this course, I think he is precluded from resorting to any other mode to show their interest. This doctrine, I think, is established by the passages referred to in 1 *Greenleaf on Evidence;* and also by authorities collected in the *Notes to* 1 *Starkie on Evidence, page* 124. The exceptions to the evidence of George Williams and Nathaniel Williams, I do not undertand to be much insisted on, and certainly, I can see no ground upon which they can be excluded.

I do not find it necessary to go in detail over the exceptions which the counsel in this case, on each side, have placed upon the record, to much of the evidence which has been offered upon either side ; and I deem it enough to say, that my conclusions upon the whole case, are founded upon proof which I think admissible and competent, and that I have very carefully read and examined it all.

The settlement, which it was the leading object of this bill to vacate, bears date on the 1st of June, 1844. It was signed by a number of shareholders in the Savage Manufacturing Company, and by the complainant, and Mayer and Burnap, his trustees.

The language of the agreement is : that the proprietors of the Savage Manufacturing Company, on the one part, and Amos A. Williams and the trustees of his estate, on the other part, do mutually agree to settle and adjust all claims and demands between them, on the following terms, to wit : It then provides for a release of him and his estate from all claims and demands of every kind, owing by him or his estate to the company, who engages to pay a debt due from him to Richard H. Waters ; and the said complainant and his trustees, besides other stipulations on their part, agree to assign and transfer unto the Savage Manufacturing Company, by a transfer on their books, bearing even date with these presents, stock in said company representing $9,632 32, and in consideration of the premises, the parties agree that all accounts between them, from the beginning of the world unto this day, be deemed finally settled, and all claims and demands mutually released and discharged.

This agreement, though dated on the 1st of June, 1844, is said not to have been consummated by the signatures of the requisite number of shareholders, until the 20th of July following, on which day Amos A. Williams, and Burnap and Mayer, in their capacity of trustees, under the conventional deed of the complainant, and as his permanent trustees in insolvency, transferred to the defendant, conformably with the preceding agreement, on the books of the company, shares and an interest rep-

27*

resenting the sum of $9,632 32, and on the same day, made
similar transfers to Martha Weld and Nancy W. Burnap, to the
former, to the amount of $2,100, at par, and to the latter, (who
was the wife of Burnap, one of the trustees,) to the amount of
$14,000, at par.

The deed which was executed by the complainant to Messrs.
Mayer and Burnap, on the 15th of September, 1840, was,
among others, upon the trust that the trustees should be author-
ized "to adjust and settle with the corporation called the Sav-
age Manufacturing Company, all the accounts between said
Amos and said corporation ; and in the event of any amount
upon such adjustment appearing to be due by said Amos to said
corporation, said trustees may agree with said corporation for
the satisfaction of said liability, by surrender or transfer to said
corporation of such number of shares of said Amos of said cap-
ital stock, and such diminution or abatement of his interest in
the said stock, or the property of the said corporation, as to
said trustees may appear proper." And there was a further
trust providing for the settlement of the claims of those to whom
the said Amos might be indebted, on account of the purchases
of lands, by conveying the same to the parties to whom the
money might be due.

Apart from the merits of the case, as disclosed by the plead-
ings and proofs, several questions of law have been discussed,
and particularly it is insisted by the defendant, that whatever
may be thought of the transaction in question, and though the
settlement assailed by the bill might be obnoxious to objection,
if impeached by the trustees, Mayer and Burnap, that still, upon
this bill, and upon the plaintiff's own showing, he can have no
relief, because he has failed to show a title in himself to the
stock, a re-transfer of which is sought. The ground of this
objection is, that the whole property of the complainant having
been vested in the trustees, Mayer and Burnap, by the conven-
tional deed, and by operation of the insolvent laws, and it ap-
pearing by the bill and the decree of the Chancellor, of Decem-
ber, 1845, that the re-conveyance ordered by that decree, did
not extend to property which the trustees had parted with, in

the execution of their duty as such trustees in insolvency, and as the trustees had, in that capacity, transferred this stock to the defendant, it follows, that the plaintiff, by his own showing, has no title, and this objection to the bill is taken by exception.

There is apparently much force in the objection, but, in my opinion, it is not fatal to the plaintiff's case, if in other respects he has established his title to the aid of the court.

One of the trusts of the deed of September, 1840, is, that after satisfying the purposes of the deed, which were the payment of the creditors of the grantor, the residue of the property, or its proceeds, was to be held for the use of the said grantor, his executors, &c.; and it very distinctly appears by the bill in this case, and by the proceedings in the case which led to the decree of December, 1845, and by that decree, that all the debts of the grantor have been paid and satisfied, and if this statement be true, it follows, of course, that the title to this stock in equity should be in the complainant, if he has succeeded in showing that it was improperly transferred to the defendant.

It is said, however, that the right to recover, if any such right exists, is in Mayer and Burnap, the trustees, and that they are the parties who should have demanded the re-transfer, the legal title being alleged to be in them, unless it has been transferred to the defendant. But the legal title which had been in these trustees was unquestionably vested in the defendant, by the transfer of 1844 ; that transfer was made by those gentlemen in the double capacity of conventional trustees, and trustees in insolvency, and, therefore, if no relief can be had by a re-transfer, except upon the footing of a legal title, the trustees, Mayer and Burnap are as powerless as the present complainant. My opinion upon this question is, that as it is charged in the bill that the purposes of the trust have been accomplished by the payment of the debts of the complainant, and as upon that event he was entitled to a re-conveyance from his trustees in insolvency, which has been decreed him, and as under the voluntary deed, the residue after the payment of his debts, was to be held in trust for him, he is now entitled to maintain this bill against

the present defendant, to whom the trustees transferred the legal title to the property in dispute.

I can see no sufficient reason why the court should first decree a transfer of this stock to the trustees, that they might then immediately afterward, be compelled to transfer it to the complainant. The legal title is in the defendant, and if that legal title has been improperly obtained, the defendant should be required to convey at once, and without circuity, to the party ultimately entitled.

Nor, do I think, that the trustees, Mayer and Burnap, were necessary parties, as is also insisted by the defendant. They have, as I think, no interest in the suit, and against them, if before the court, no decree could be had, and consequently they cannot be considered necessary parties. *Story's Eq. Pl.*, sec., 231; *Smith* vs. *Snow et al.*, 3; *Mad. Rep.*, 13.

Considering, then, that the plaintiff has a standing in court, to ask for relief in respect to the transactions spoken of in the bill, if he has shown himself entitled upon the merits, it becomes necessary to examine the case upon its merits, and this will be done as briefly as possible.

———

The bill, as we have seen, prays that the settlement of June, 1844, may be opened, upon the ground of fraud, and that the complainant may be permitted to surcharge and falsify the account in the particulars mentioned, and in such others as may become apparent in the progress of the cause.

The allegation is, that the stated account was fraudulent in fact, and in contemplation of law, and known to the framers thereof to be such.

In the argument, however, the Chancellor understood that the charge of fraud in fact was, if not abandoned, at least not pressed, and the aid of the court was asked upon the ground that this settlement, under the peculiar circumstances attending it, though not characterized by fraud in fact, that is, by a preconceived and concerted design to defraud the complainant, was yet in contemplation of a court of equity, constructively fraudulent, and equally invalid as if contaminated with pre-

meditated fraud, or at any rate the errors to the prejudice of the plaintiff, charged to exist in the account upon which the settlement is alleged to have been based, entitled the plaintiff to permission to surcharge and falsify it.

With regard to the charge of fraud in fact, which charge in the bill is especially directed against Nathaniel Williams and George Williams, I am altogether convinced that it is destitute of foundation.   So far as George Williams is concerned, it is perfectly obvious, if any confidence is to be placed in human testimony, that he was, from the beginning, and continually to the conclusion of this whole transaction, most vehemently opposed to the settlement—the record is so full of evidence on this point, that it is impossible to entertain a doubt upon the subject.

With respect to Nathaniel Williams, though it was chiefly through his agency that the settlement was effected, I do not think a reasonable suspicion can be entertained, but that he honestly believed, whatever the fact may turn out to be, that his brother, the complainant, was indebted to the defendant in at least the sum agreed upon.   The bill charges, that when the brothers, George, Cumberland and Nathaniel, were frustrated in their design to secure to themselves the property of the complainant, by procuring him to execute a will, they formed the design to destroy that which they could not obtain, and that having first instigated his creditors to sue him, Nathaniel suggested that he should convey his property in trust to Messrs. Mayer and Burnap.   Now, when it is recollected, that Mr. Mayer was the counsel of the complainant, and Mr. Burnap his son-in-law, it appears to me that the advice that they should be appointed his trustees, infers any thing else than a design to take advantage of him.   But, without going into details, which would be tedious and unprofitable, I content myself with saying, that upon a careful examination of all the evidence, I do not see a single circumstance upon which, fairly construed, the charge of fraud against Nathaniel Williams can be supported.

I, therefore, dismiss the charge of fraud in fact, which, as it is never to be presumed in any case, certainly should not, in a

case like this, be inferred upon any but the strongest evidence. I do not, however, place my conviction of its non-existence in this case upon the ground that as between parties, bearing the relations to each other which these parties do, more stringent evidence will be required to establish fraud than in an ordinary case, but upon the higher ground, that however Mr. Williams may have been mistaken as to the actual state of the accounts between his brother and the company, nothing was farther from his intention, as I am satisfied, than to impose upon him to the extent of a dollar. It is quite obvious that he carried through the settlement in defiance of the strong resistance of those who had better opportunities than himself of knowing how the accounts stood, and that at one period, the immediate family of the complainant, so far from complaining of him for his efforts to effectuate the settlement, were dissatisfied with the parties who made opposition to it.

It is next to be considered whether this settlement was made under such circumstances of error and mistake, as to render it constructively fraudulent, and this question is supposed to depend upon whether it was based upon a statement of accounts, or, according to the ground taken in the answer, it was a compromise of conflicting and unascertained claims, preferred by the defendant against the plaintiff. If the latter, that is, if it was a compromise of claims of this description, it is insisted it can only be impeached upon the ground of actual fraud.

Upon a very careful investigation of the evidence, my mind is brought to the conclusion, that the accounts procured by Nathaniel Williams from George Williams, were the basis upon which the settlement was made—that Mr. Mayer, and Mr. Mayhew, who was consulted as a friend, assented to the terms proposed, upon the assumption that these accounts were correct, and that, but for that assumption, they would not have advised the settlement. I do not, therefore, regard the settlement as a mere compromise, but as an agreement to settle, in the mode proposed, a claim which was presented in the form of a stated account, which, without examination, was assumed to be correct. This is certainly true with regard to the account

marked J. J., to which, as the evidence shows, a portion of the claim called the furnace account was added, to make up the amount at which the whole claim was settled.

Now, I cannot see how it can be said, at least that the account marked J. J. did not furnish the basis of the settlement— and if this be so, then it follows, that independently of the question of fraud, actual or constructive, the plaintiff will be allowed to surcharge and falsify it, to the extent of the errors specified in his bill. 1 *Story's Eq.* sec., 523; 1 *Daniell's Ch. Pr.*, 761, 765; *Barrow* vs. *Rhinelander*, 1 *Johns. Ch. Rep.*, 550.

There is a circumstance connected with this case, which, though it does not, in my judgment, invalidate the whole settlement, and induce me to set it aside altogether, is yet, I think, entitled to great weight upon the question of allowing the plaintiff to surcharge and falsify the account. There seems to me no doubt that the plaintiff, for a considerable period, extending, probably, from the year 1839, to the fall of 1844, was, though not perhaps actually *non compos mentis*, deprived of much of the mental capacity which he had before possessed. No man, I think, can read this record, and not come to this conclusion, and I cannot but persuade myself, that in his condition, when these accounts were presented to him, he was incapable of giving them that examination which was indispensable to their full comprehension. His mind had lost much of its vigor, and painfully sympathised with the infirmity to which his physical nature was a prey. The complainant then, as I think, was unable to understand these accounts, and the trustees, and the friend called in, did not examine them—all assuming their correctness as the basis of the agreement.

Now, I feel a strong conviction, under these circumstances, that even regarding this settlement as a family arrangement, which the court will usually uphold with a strong hand, that still it is its duty, if errors are pointed out, to permit the plaintiff to surcharge and falsify the account on which the settlement was made. This course seems to me to be in conformity with the doctrine of Mr. Justice Story, in the 1st volume of his Equity Jurisprudence, sections 131, 132.

[The defendant, against whom the order was passed on the 22d of November last, in conformity with the views expressed by the Chancellor in his opinion of that date, appealed, and filed an appeal bond in form and penalty, and with condition and sureties approved by the court. The order appealed from, however, being within the provisions of the act of 1845, the appeal bond alone does not operate as a supersedeas, and the application now made, is, that the court by special order, stay the execution of the order appealed from.

Upon this application the Chancellor says :]

This is an application founded upon the act of 1845, chap. 367, which gives the right of appeal from the decrees and orders of the equity courts of this state in a class of cases in which the right did not exist before.

The right is extended to decrees or orders, determining a question of right between the parties, and directing an account to be stated on the principles of the determination, with a proviso, that appeals taken under the provisions of the act, shall not delay the execution of the decree or order, unless the court passing the same shall so direct ; nor unless the party prosecuting the appeal shall give an approved appeal bond.

The parties have been heard by counsel upon this application, and the court will, as briefly as possible, state the reasons of the conclusions to which a careful consideration of the circumstances of the case has brought it.

This is understood to be the first application of the kind, for though several appeals have been prosecuted under the act of assembly, and the proceedings under the decrees and orders appealed from, have been suspended until decisions were had in the appellate court, this appears to have been the result of agreement, the power of the court not having been specially invoked in any instance so far as I am informed.

In England, the rule appears to be established, that an order for a re-hearing, or an appeal, will not stop proceedings under the decree or order appealed from, without a special order. 3 *Daniell's Pr.*, 1611.

The reverse, however, appears to be the case in New York, where an appeal does, in the first instance, stay proceedings on the point appealed from, and, if the party obtaining the decree wishes to proceed, notwithstanding the appeal, he must make application to the Chancellor for liberty to do so. *Green* vs. *Winter*, 1 *Johns. Ch. Rep.*, 80, 81.

It does not appear to me, however, to be material to investigate very minutely, the rule in England or elsewhere, as there can be no doubt, than an appeal and bond to prosecute the appeal, under the act of assembly in question, will not, independently of the order of the court, delay the execution of the order or decree appealed from. If the execution of the decree or order is to be suspended, it must be by force of the special direction of the court given for that purpose. Whether such direction shall or shall not be given, is referred by the legislature to the sound discretion of the court, upon a view of all the circumstances of the case. If the court, upon consideration of the circumstances, shall think that greater inconvenience and injury will result to the appellant from proceeding to execute the order, pending the appeal, than would be sustained by the opposite party by delaying it, then the execution should be suspended, if otherwise, the execution should not be delayed.

The court, in this case, has no reason to think, that the appeal has been taken for the mere purpose of delay and vexation. The case is one of much importance in several aspects, the questions interesting, and some of them novel, and the order of the court appealed from, vital to at least some of the most material points involved in the cause, and upon which the defence was placed.

It was the undoubted right of the defendant, to appeal from this order, and this court certainly feels no inclination to abridge the right, or so to proceed to execute its order, that irreparable mischief shall be inflicted, if the order upon the appeal shall be pronounced erroneous.

The order appealed from, in this case, not only decides, that the settlement of 1844, was founded upon the basis of accounts between the parties, contrary to the defence taken in the

answer, but it gives to the complainant, leave to surcharge and falsify the account in certain particulars, and decides definitively certain points in difference, which must change, essentially, the state of accounts between the parties; leaving others open for further evidence. It is said by the plaintiff, that an account stated upon the principles of the order in question, will entirely shift the balance, and show the plaintiff to be a creditor, instead of a debtor, as he appeared to be, to a large amount, by the account upon which the settlement was made.

It is not, then, an order, simply determining a question of right between the parties, and directing an account generally, as in the case of Forbes vs. Forbes, referred to in the argument; but, it is an order, determining to a considerable extent the elements of which the account shall be composed. It decides, that the complainant, in the settlement complained of in the bill, was charged with several sums of money erroneously, which of course are to be struck from the account, and, that he should be credited with other sums which were not credited. Upon some of these items the decision is final, as much so as if the Auditor had stated an account in conformity with the order, and his account had been ratified.

This order, therefore, differs widely from an order simply rescinding a settlement between parties, and directing an account upon certain legal principles declared by the court, leaving the adjudication of every thing else open for further consideration.

Upon appeal from an order of this latter character, the reviewing court, in any event, whether they reverse or affirm the order, unless, indeed, they dismiss the bill, must remand the cause to this court, when the whole question of the account, should an account be ordered, would be open to the same extent as before the appeal, and the almost inevitable result would be a second appeal after the account should be taken and affirmed. This, however, is not likely to be the case here, as upon reviewing the order of this court, the Court of Appeals will have before them the materials for putting an end to the controversy.

There seems to me, therefore, to be much more propriety in abstaining from proceeding with the execution of such an order as this, than an order which though it may determine a question of right between the parties, as by vacating a deed or settlement, leaves the whole question of the account open for further directions.

There are, as was said by Chancellor Kent, in Green vs. Winter, difficulties in laying down a general rule in such cases. To proceed as of course in a cause pending an appeal, might lead to a great deal of useless labor and expense to the parties, and sometimes to irreparable mischief, and, on the other hand, to permit the proceedings to be stayed in every case, would render a chancery suit the greatest nuisance.

It seems to me, that to proceed with the execution of the order appealed from, in this case, pending the appeal, might not only subject the parties to useless labor and expense, but might be productive of irreparable mischief. If the Court of Appeals should differ from the Chancellor, either with regard to the character of the settlement, or the principles upon which the account should be stated, or in his conclusions of fact, and the order of this court shall, in the meantime, be executed, it is manifest, that irreparable injury may be done, because, it may be impossible to restore the parties to the situation they previously occupied, or repair the consequences of the decree. It is said, however, that the defendant may obviate these consequences, by appealing from the final decree, and filing a new appeal bond. But this would involve the necessity of carrying two voluminous records to the superior court, at great expense, and, moreover, though the defendant has now been able to give an approved bond, in a penalty sufficient for this occasion, it does not follow, of necessity, that when the final decree shall be pronounced, and perhaps a larger penalty required, that a bond with adequate names can be given.

I feel sensibly the argument founded upon the delay, which the judgment I have formed upon this motion may occasion. But, looking to the character of the order appealed from, the length to which it goes in determining the rights of the parties,

the consequences which may result from its enforcement, if the Court of Appeals should consider it materially erroneous, and furthermore, seeing that as the record will be presented to the appellate court, almost every question of law and fact, involved in the cause, may be finally decided, and thus the delay apprehended essentially shortened. I am persuaded, that justice requires that the execution of the order of this court, passed on the 22d of November last, shall be stayed, pending the appeal, or until further order. It is thereupon ordered, that the execution of the order of this court, passed on the 22d of November, 1848, be, and the same is hereby, stayed, until the appeal from said order shall be heard and decided by the Court of Appeals, or until the further order of this court in the premises.

[The first order in this cause was affirmed on appeal, and the cause remanded with liberty to amend the pleadings.]